[No. 48294–2. En Banc. January 26, 1984.]

THE STATE OF WASHINGTON, *Appellant,* v. JAMES
S. BLACK, ET AL, *Respondents.*

*Kenneth O. Eikenberry, Attorney General, John R. Ellis, Deputy,* and *James M. Beaulaurier, Assistant,* for appellant.

*Lukins & Annis, P.S.,* by *Terence R. Whitten* and *Judith A. Butler; Paine, Hamblen, Coffin & Brooke,* by *Richard D. McWilliams; Bastine, Coombs & Grabicki, P.S.,* by *Paul A. Bastine* and *Anthony E. Grabicki,* for respondents Black, et al.

*Witherspoon, Kelley, Davenport & Toole, P.S.,* by *John E. Heath,* for respondents Hege, et al.

STAFFORD, J.—Appellant, State of Washington, seeks reversal of the trial court decision which held that the alleged conduct of respondent real estate brokers did not constitute an unfair method of competition under RCW 19.86.020. The State further challenges the trial court's conclusion that respondent Black did not violate the terms of a 1974 consent decree. Finally, the State asks us to determine whether the trial court erred in awarding attorney's fees to the prevailing defendants pursuant to the discretionary authority granted under RCW 19.86.080.

We affirm the trial court's conclusion that respondents did not violate RCW 19.86.020. We also affirm the court's decision to award attorney's fees pursuant to RCW 19.86-.080. We reverse the trial court's determination that respondent Black did not violate the 1974 consent decree. We remand the cause for determination of the latter issue and for modification of the award of attorney's fees. The attorney's fees incurred by respondent Black in defense of the consent decree allegation should not be allowed.

On June 14, 1978, the State Attorney General filed this civil antitrust action against 14 Spokane area real estate brokers and the Spokane Board of Realtors. The complaint alleged that the defendants combined and conspired to eliminate price competition in violation of RCW 19.86.030 and engaged in unfair methods of competition in violation of RCW 19.86.020. The complaint further alleged that respondent, James S. Black and Company, violated the terms of a 1974 consent decree entered in a prior antitrust action. The State sought civil penalties, an injunction against further violations and an award of attorney's fees and costs. Prior to trial, the State signed consent decrees with 10 of the individual brokers and the Spokane Board of Realtors. Respondents, James Black, Ken Tupper, Clark Hege, Charles Sullivan and their respective real estate companies were the only remaining defendants at trial and are the only respondents on appeal.

Respondents are all members of the Spokane Multiple Listing Service (MLS). Under the MLS rules, member brokers submit their listing contracts to the MLS which in turn publishes the pertinent information for use by other members. Any member broker is authorized to sell an MLS listing to a prospective buyer. A sale of property which is listed by one broker but sold by another is known in the industry as a "cross-sale". When a cross-sale is made, the listing broker splits part of its commission with the selling broker. The MLS policy during and prior to 1977 was to publish the total commission rate and the commission split which was offered to a selling broker in the event of a

cross–sale. Testimony at trial indicated that prior to the time in question, most, but not all, brokers charged a 6 percent commission on new construction and a 7 percent commission on resale homes. The standard commission split between the listing and selling brokers was 50/50. Thus, on a 7 percent resale contract, a selling broker would receive 50 percent of the 7 percent commission or 3.5 percent of the total selling price.

The present controversy arose in May 1977 as a response to the adoption of a new marketing program instituted by Victor Lewis Realty (Lewis), known as the "Seller's Choice" program. Under this program, a property seller was given two options. The seller could agree to pay a 5 percent commission and receive the usual brokerage services. If the seller was willing to do some of the work, the seller could opt to pay a flat fee of $750. In return, Lewis Realty would appraise the property, post a sign on the property, provide limited advertising, list the property with the MLS and draw up the earnest money agreement if a buyer was found. The flat fee option required that the seller show the property and conduct its own preliminary negotiations with a prospective buyer. The program was designed to attract the "for sale by owner" seller. If a seller who opted to pay the flat fee was unhappy with the do–it–yourself arrangement, the seller could convert the contract to a full–service commission arrangement.

The program was introduced through newspaper and display advertisement. The initiation of the Seller's Choice program triggered an immediate reaction throughout the Spokane real estate market. The trial court found that it also generated a great deal of confusion. Although there was some testimony indicating that Lewis first offered a two–thirds/one–third split on a flat fee listing, Lewis made it clear at a June 16, 1977, brokers meeting that all Lewis listings, including flat fees, would continue to be listed through the MLS and that the commission split on a cross–sale was 50/50. Lewis continued to offer 6 and 7 percent commissions in addition to his Seller's Choice options.

Testimony at trial indicated that other brokers could not determine from the MLS information submitted by Lewis whether a particular listing was flat fee or commission without first contacting Lewis. Testimony further indicated that even though Lewis' salespeople were not obligated to show flat fee listings, salespeople from other brokerages felt it was their duty to show any home which was of interest to a prospective buyer. Thus, other brokers faced the possibility of providing full services on flat fee listings in return for half of the $750 fee. The trial court found that $375 was not enough to meet expenses in such a transaction. Even with a 5 percent commission, the trial court found that only companies with low overhead, such as Lewis, could economically survive.

Prior to the adoption of the Seller's Choice program, each of the respondent brokers maintained a 50/50 commission split policy with Lewis. Beginning in June and continuing for the next 3 months, Lewis received letters from nine Spokane brokers, including all four respondents, reducing their commission splits with Lewis Realty. On June 22, 1977, respondent Black indicated it would pay a flat rate of $250 on any Black–Lewis cross–sales—regardless of the actual commission. Respondent Tupper announced it would pay only 10 percent of the commission. Respondent Sullivan reduced its split to 90/10 while respondent Hege reduced its split to 85/15. At trial, respondents explained that the new splits were necessary to equalize the commission shares paid to Lewis with what they could expect to receive from Lewis. Testimony at trial showed that flat fee listings comprised a significant percentage of all Lewis listings following adoption of the Seller's Choice program and further that almost half of the Lewis flat fee listings were sold by other brokers. Testimony at trial also indicated that during the same period, respondents Black and Tupper changed their commission split policies with other real estate brokers. There was considerable conflicting testimony at trial concerning whether respondent brokers boycotted Lewis listings or disparaged

their services to Lewis customers. The trial court found, however, the respondents neither collectively nor individually engaged in such activity.

At the conclusion of a 3-week trial, the court found that the State had failed to prove any conspiracy under RCW 19.86.030.[1] Rather, the court found that each respondent acted unilaterally for legitimate business reasons. The court specifically concluded that the individual, unilateral changes in the commission split policy were not violations of RCW 19.86.020.[2] The trial court further found that because respondent Black had not engaged in any violation of RCW 19.86.020 or .030, he had not violated the terms of his 1974 consent decree. Over the vigorous objection of the State, the court awarded attorney's fees and costs to the prevailing defendants totaling $289,522.61.

The State appeals directly from the trial court's decision, presenting three issues for review. We turn first to appellant's contention that the trial court erred in finding respondents did not violate RCW 19.86.020.

I

UNFAIR METHODS OF COMPETITION
UNDER RCW 19.86.020

We note at the outset that the State's energies at trial were focused almost exclusively on proving that respondents *conspired* to eliminate competition in violation of RCW 19.86.*030*. The State nevertheless has chosen not to appeal from the trial court's conclusion that respondents did not engage in any kind of conspiracy. Rather, the crux of the State's argument on appeal centers on what the

---

[1]RCW 19.86.030.

"Contracts, combinations, conspiracies in restraint of trade declared unlawful. Every contract, combination, in the form of trust or otherwise, or conspiracy in restraint of trade or commerce is hereby declared unlawful."

[2]RCW 19.86.020.

"Unfair competition, practices, declared unlawful. Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

State believes to be a mistaken assumption by the trial court that *concerted* activity is an essential element of "unfair methods of competition" within the context of RCW 19.86.*020*. The State urges that even where there is no *conspiracy,* anticompetitive *unilateral* conduct is sufficient to find an RCW 19.86.*020* violation. The State further argues that there is "overwhelming" evidence from which to conclude that respondents' reduced commission splits were in fact unfair and anticompetitive.

Although respondents contend that the State has raised a totally new argument on appeal, we find the parties as well as the trial court understood the allegations at trial to include violations of *both* RCW 19.86.030 and .020. Therefore, it is proper for us to address the State's arguments concerning the alleged .020 violation.

Our State Consumer Protection Act was enacted in 1961 to promote free competition in the marketplace for the ultimate benefit of the consumer. The act is patterned to a large extent after federal trade regulation statutes. RCW 19.86.030 prohibiting contracts or conspiracies in restraint of trade is our State's equivalent of section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, while the monopolization provision, RCW 19.86.040, is taken from sections of the Clayton Act, 15 U.S.C. § 14. The unfair methods of competition provision is taken verbatim from section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1). When the Legislature enacted the Consumer Protection Act, it anticipated that our courts would be guided by the interpretation given by federal courts to their corresponding federal statutes. RCW 19.86.920. Although we have determined that RCW 19.86.020 is not unconstitutionally void for vagueness, *State v. Reader's Digest Ass'n,* 81 Wn.2d 259, 501 P.2d 290 (1972), *appeal dismissed,* 411 U.S. 945 (1973), we have not had an opportunity to determine what kind of conduct may constitute an "unfair method of competition". Therefore, we may look to federal law for guidance.

Section 5 of the Federal Trade Commission Act was

enacted many years after the passage of the Sherman and Clayton antitrust acts. It is clear that conduct which violates the letter of either the Sherman or Clayton antitrust laws will also constitute an unfair method of competition under section 5. *FTC v. Cement Inst.,* 333 U.S. 683, 92 L. Ed. 1010, 68 S. Ct. 793 (1948) (violation of Sherman act, section 1 is also violation of FTC act, section 5); *Fashion Originators' Guild of Am. v. FTC,* 312 U.S. 457, 85 L. Ed. 949, 61 S. Ct. 703 (1941) (violation of Clayton Act includes violation of FTC act, section 5). The prohibition against unfair methods of competition contained in section 5, however, has been interpreted to be supplemental to and not duplicative of the antitrust provisions contained in the Sherman and Clayton acts. *FTC v. Motion Picture Advertising Serv. Co.,* 344 U.S. 392, 97 L. Ed. 426, 73 S. Ct. 361 (1953). *See generally* Averitt, *The Meaning of Unfair Methods of Competition in Section 5 of the Federal Trade Commission Act,* 21 B.C. L. Rev. 227 (1980). Thus, conduct which threatens an *incipient* violation of one of the antitrust laws will be a violation of section 5. *Triangle Conduit & Cable Co. v. FTC,* 168 F.2d 175 (7th Cir. 1948).[3]

 Apart from an incipiency theory, conduct which violates the *spirit* of the antitrust laws may also constitute a section 5 violation even though it does not actually threaten to violate the law. *FTC v. Brown Shoe Co.,* 384 U.S. 316, 16 L. Ed. 2d 587, 86 S. Ct. 1501 (1966). It is clear, then, that a violation of Federal Trade Commission Act section 5 does not require a finding of conspiracy. Likewise, a violation of RCW 19.86.020 does not require a finding of conspiracy. Thus, unilateral conduct which is unfair and anticompetitive may constitute a violation of RCW 19.86.020.

The State's contention that the trial court failed to con-

---

[3]Although in that case the Seventh Circuit Court of Appeals characterized a basing–point price scheme among electrical manufacturers as a conspiracy to stabilize price competition, the court went on to find that the unilateral adoption of such a system could also be prohibited as unilateral conduct can be the first step toward a conspiracy. *Triangle Conduit & Cable Co. v. FTC,* 168 F.2d 175, 180 (7th Cir. 1948).

sider whether unilateral conduct could constitute a violation of RCW 19.86.020 stems from conclusion of law 6 which reads:

> As long as notification of a change to one broker's commission split with another broker is done on an individual basis, it does not constitute unfair method[s] of competition and is not a violation of either RCW 19.86-.020 or .030.

Clerk's Papers, at 567. See also Clerk's Papers, at 281–82. A reading of this conclusion alone does give the impression the trial court believed that conspiracy was a prerequisite for both section .030 and .020 violations. If the findings of fact and conclusions of law are read together with the trial court's memorandum opinion, however, we find that the trial court understood the requirements of RCW 19.86.020. Even though we hold that the trial court understood the law, we must still determine whether the trial court erred in concluding that respondent's unilateral conduct as set forth in the findings of fact was not an unfair method of competition.[4]

As noted above, the phrase "unfair methods of competition" has never been defined by this court. The United States Supreme Court has said that the term can be defined only by "'the gradual process of judicial inclusion and exclusion.'" *FTC v. Raladam Co.*, 283 U.S. 643, 648, 75 L. Ed. 1324, 51 S. Ct. 587, 79 A.L.R. 1191 (1931). The Court suggested in *Raladam* that by the words "unfair methods" was meant "those resorted to for the purpose of destroying competition or of eliminating a competitor or of introducing monopoly . . ." *Raladam,* at 650. The *Raladam* Court adopted a standard of substantial injury to or tendency to injure the business of a competitor. *Raladam,* at 652.

█ The State contends that respondents' reduced commission splits were retaliatory and punitive, thus restrain-

---

[4]We note that several of the findings of fact, particularly numbers 28, 39, 40 and 45 appear to be conclusions of law. Findings of fact that are actually conclusions of law will be treated as conclusions of law. *State v. Reader's Digest Ass'n,* 81 Wn.2d 259, 501 P.2d 290 (1972), *appeal dismissed,* 411 U.S. 945 (1973).

ing competition in violation of RCW 19.86.020. To support its contention, the State takes exception to several of the trial court's findings of fact indicating a lack of boycotting and disparaging activities. Indeed, most of the State's opening and reply briefs are dedicated to challenging the findings of fact as well as reinterpreting the evidence presented at trial. This court is not a trier of fact, however. Where there is substantial evidence to support the trial court's findings of fact, we will not disturb them on appeal. *Ridgeview Properties v. Starbuck*, 96 Wn.2d 716, 638 P.2d 1231 (1982). Even where the evidence conflicts, a reviewing court must determine only whether the evidence most favorable to the prevailing party supports the challenged findings. *North Pac. Plywood, Inc. v. Access Rd. Builders, Inc.*, 29 Wn. App. 228, 232, 628 P.2d 482 (1981). After reading the transcript of proceedings, we find that although we might have interpreted the evidence differently had we been the trier of fact, the trial court's findings of fact are supported by the evidence.

Having accepted the trial court's findings as written, we conclude that the only conduct which could possibly constitute an unfair method of competition was the respondent brokers' individual action in sending letters to Victor Lewis announcing a reduced commission split. It is clear from the record that these letters were written in response to the Lewis Seller's Choice program. The trial court concluded, however, that the letters were written for legitimate business reasons and thus did not constitute an unfair method of competition.

Under a *Raladam* standard of "substantial injury", the trial court may well have erred in not finding an unfair method of competition. Certainly Lewis was injured monetarily and other brokers were discouraged from implementing a similar program. We choose, however, not to adopt the federal court definition of unfair method of competition.

■ In passing the Consumer Protection Act, the Legislature specifically recognized that acts or practices which

are reasonable business practices or which are not injurious to the public are not the kind of acts sought to be prohibited. RCW 19.86.920. This consideration, which is not part of the federal statutory scheme, warrants a narrower interpretation of the words "unfair method of competition" than that given by federal courts. By expressly allowing for reasonable business practices, our Legislature recognized that a court must weigh the public interest in prohibiting anticompetitive conduct against the recognition that businesses need some latitude within which to conduct their trade. In acknowledging that the letters written by respondent brokers were motivated by legitimate business concerns, the trial court implicitly acknowledged that the respondents' actions were not the kind of conduct within the scope of RCW 19.86.020.

A reduction in commission splits may not be the fairest way to do business; however, we find that the trial court's findings of fact and conclusions of law are supported by the evidence. We therefore affirm the trial court's disposition of this issue.

## II
### THE 1974 CONSENT DECREE

In 1974, the State Attorney General brought a civil antitrust action against Black and other Spokane realtors for what was alleged to be an attempt to fix a standard commission rate of 7 percent for resale contracts. The case was settled before trial and as part of the settlement, James S. Black Co. entered a consent decree which enjoined him from certain conduct related to price fixing. The relevant terms of this consent decree are set forth in the appendix.

The trial court found that respondent Black sought advice from the Attorney General's office prior to changing his commission split policy and thus made a good faith effort to avoid violation of the 1974 consent decree. The court further concluded that the consent decree should be interpreted narrowly to require only that Black comply with the antitrust and competition laws. Thus, it is urged,

in the absence of a finding that Black violated RCW 19.86-.030 or .020 there can be no finding that Black violated the terms of the consent decree. We disagree.

■ The 1974 consent decree is phrased in broad terms prohibiting even the *indirect* recommendation or suggestion of uniform commissions. The evidence at trial shows that by adopting a reciprocity basis for commission splits, Black made it clear to other brokers that if they wanted 3.5 percent of the selling price as a commission split, they would have to maintain a 7 percent commission with a 50/50 split. This conduct violates the literal terms of the 1974 consent decree regardless of whether it also constitutes an unfair method of competition under RCW 19.86-.020.

We give no weight to the fact that Black sought advice from the Attorney General and believed that office to have approved the reciprocal commission split by silent acquiescence. It is apparent from the trial court's memorandum opinion that the Attorney General gave only very limited approval pending more facts and that Black did not make known his desire for a quick answer.

A good faith effort to comply is irrelevant. The real question is whether Black complied with the literal terms of the 1974 consent decree. The trial court erred both in relying on Black's apparent good faith and in believing that a violation of the Consumer Protection Act was necessary to find violation of the consent decree. We therefore reverse the trial court and remand the matter for further consideration.

### III
### ATTORNEY'S FEES

RCW 19.86.080 provides that in a suit by the Attorney General to enforce the provisions of the Consumer Protection Act, the court *may,* in its *discretion,* award reasonable attorney's fees and costs to the prevailing party. The State contends this discretion should be exercised only when the action is "frivolous, unreasonable and without foundation."

We disagree.

It is clear that in making the award of attorney's fees discretionary in Attorney General suits while mandatory for prevailing plaintiffs in private actions, RCW 19.86.090, the Legislature intended that the courts develop standards to guide the exercise of their discretion. *See* Comment, *Reasonable Attorneys' Fees and Treble Damages—Balancing the Scales of Consumer Justice,* 10 Gonz. L. Rev. 593, 616 (1974). The Court of Appeals, Division One, recently had occasion to address this issue and concluded that the answer lies in balancing the competing policy interests. *State v. State Credit Ass'n,* 33 Wn. App. 617, 657 P.2d 327 (1983).

As authority for a limited discretion standard, the State cites a federal case interpreting language identical to that of RCW 19.86.920 contained in section 706(K) of Title VII of the Civil Rights Act. *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 54 L. Ed. 2d 648, 98 S. Ct. 694 (1978). In that case, the Court found that different policy considerations came into play when the government prevailed than when the defendants prevailed. The Court noted first that, in civil rights cases, the plaintiff is the "chosen instrument of Congress" to vindicate public policy and, second, that awards to prevailing plaintiffs punish violators of the law. *Christiansburg,* at 418–19. Countervailing policy considerations were absent when the defendants prevailed, thus the Court allowed an award of attorney's fees to prevailing defendants only in those cases which were clearly frivolous, unreasonable and without foundation. *Christiansburg,* at 422.

While the statutory language at issue in the *Christiansburg* case is identical to that of RCW 19.86.020, the policy considerations are significantly different. It is true that the Attorney General has an important role to play in enforcing our State's antitrust laws, but as noted by the Court of Appeals in *State Credit Ass'n,* the State has powerful civil litigation resources available at its disposal. Small businessmen may be forced into bankruptcy to

defend what may turn out to be legitimate business practices. Thus, the State's interest must be weighed against the realization that vindicated defendants should be treated fairly.

We note the Attorney General need not have brought this suit as an identical civil antitrust action was filed by Lewis in United States District Court for Eastern Washington in February 1978. That suit is still pending. Moreover, the fact that 10 brokers signed consent decrees does not necessarily indicate their guilt. It is just as likely that the costs of defending a complex, lengthy antitrust case may have been considered too high.

Given the complexity of this case, the enormous amount of time and energy spent in discovery and the duplicative nature of the lawsuit, we find the trial court properly exercised its discretion in awarding attorney's fees to respondent brokers. We decline, however, to adopt wholesale the balancing test introduced by the Court of Appeals in *State Credit Ass'n.* We agree that an award of attorney's fees under RCW 19.86.080 should not be automatic. Nevertheless, the trial court should consider the factors mentioned in *State Credit Ass'n,* at 628:

(1) the need to curb serious abuses of governmental power;
(2) the necessity of providing fair treatment to vindicated defendants;
(3) the strong public interest in continued vigorous State prosecution of consumer protection violations; and
(4) the necessity of avoiding hindsight logic in making the determination.

In addition, the trial court should consider the complexity and length of the case. The court should also consider the necessity of the lawsuit. Here, respondents were forced to defend in two separate lawsuits. Realistically, respondents could not sign consent decrees in the state lawsuit which could later be used against them in federal court.

Although we uphold the trial court's decision to award attorney's fees, we hold, however, that respondent Black is

not entitled to an award of attorney's fees for the money spent in defense of the consent decree allegation. We therefore remand for modification of the attorney's fee award to reflect our decision. We emphasize that respondent Black is not entitled to attorney's fees on this issue even if, on remand, the trial court finds that respondent Black did not violate the 1974 consent decree.

Respondent brokers have also requested an award of attorney's fees on appeal pursuant to RAP 18.1 and have complied with its requirements. We find that although the respondents have prevailed in this appeal, our affirmance of the trial court decision does not rise to the level of having "substantially prevailed" in the context of RAP 14.2. We therefore hold that each party should bear its own costs on appeal.

The trial court is affirmed in part, reversed and remanded in part for determination and modification consistent with this opinion.

## APPENDIX

The 1974 consent decree entered into by James S. Black provides in pertinent part:

Final Judgment Against Certain Parties Defendant

### I.
### Jurisdiction

This Court has jurisdiction over the subject matter of this action and of the parties hereto. The Complaint states claims upon which relief may be granted against the defendants under RCW 19.86.020 and RCW 19.86.030 commonly known as the Unfair Business Practices—Consumer Protection Act of the State of Washington.

### II.
### Definitions

A. "Any transaction involving real estate" shall mean any sale, exchange, rental, lease, management, or mortgage of real estate.

B. "Competitor" shall mean any person who is a real estate broker or salesman who is not an employee, associate broker or salesman for a party defendant, or a real estate broker or salesman participating in a joint venture with a party defendant.

C. "Cooperative sale" shall mean a sale of real property that has been

listed with one real estate broker and sold by another.

D. "Defendants" shall mean: James S. Black & Co., Inc., . . .

E. "Person" shall mean any individual, partnership, firm, association, corporation, or other business or legal entity.

F. "Rates or amounts of commissions or other fees" shall mean any rates, commissions, or other fees for the appraisal, sale, rental, lease, or management of real estate, including any rates, commissions, or other fees payable either to the selling or the listing real estate broker on a cooperative sale.

### III.
### Applicability

The provisions of this Final Judgment shall apply only to the defendants and to their officers, directors, successors, agents, and employees, and in addition to all persons who receive notice of the Final Judgment by personal service or otherwise.

This Final Judgment is for settlement purposes only with the defendants and does not constitute an admission of violation of RCW 19.86 by them. Furthermore, it is without prejudice to the State in regard to parties other than defendants James S. Black & Co., Inc. . . .

### IV.
### Prohibited Acts and Practices

Defendants James S. Black & Co., Inc. . . . . their officers and directors, and employees, whether acting unilaterally or in concert or agreement with any other person, are enjoined and restrained from:

A. Combining, conspiring, suggesting, or recommending to or with any competitor that any rate or amount of commissions or other fees in any real estate transaction be fixed, established, or maintained;

B. Suggesting or recommending to any competitor the creation or implementation of any operation procedure which has the effect of fixing, establishing, maintaining or stabilizing any rate or amount of commissions or other fees in any real estate transaction;

C. *Directly or indirectly recommending or suggesting that any competitor adhere to any schedule or other recommendation concerning the rates or amounts of commissions or other fees in any real estate transaction;*

D. Suggesting, publishing, or distributing to any competitor any schedule or other recommendation concerning the rates or amounts of commissions or other fees in any real estate transaction;

E. Publishing or distributing to any competitor any information, survey, or study relating to rates or amounts of commissions or ranges thereof or other fees included in real estate transactions effectuate in the State of Washington; provided, however, that the defendants may prepare surveys or studies of prevailing rate or amount of commissions or

other fees or their ranges for use in any civil or criminal action or proceeding before a court or agency of competent jurisdiction and provided further that any such information, survey, or study is not distributed by any of the defendants except as may be necessary or required in connection with use of such information, survey, or study before a court or agency of competent jurisdiction;

F. Establishing or organizing any other person to do any of the acts prohibited in this Final Judgment or to not do any of those acts ordered done in this Final Judgment. (Italics ours.)

WILLIAMS, C.J., and ROSELLINI, UTTER, BRACHTENBACH, DOLLIVER, and PEARSON, JJ., concur.

DORE, J. (concurring in part, dissenting in part)—I concur with the majority except for its award of attorney fees. Defendant Black should not be deemed a prevailing party when he successfully defended only one of two claims brought against him. At this stage of the proceedings, Black won one case but the judgment in his other case has been set aside by the majority here for a retrial. Until it is finally determined whether Black violated the 1974 consent decree, there can be no prevailing party, which would entitle him to attorney fees under the statute. In any event, Black should be denied attorney fees for the same reasons that apply to defendants Tupper, Hege, Sullivan and their respective real estate companies. The trial court has not as yet found that the Attorney General's cause of action was frivolous and/or groundless, and at this juncture it is premature to grant attorney fees. The issue of attorney fees for defendants Tupper, Hege, Sullivan and Black should be remanded to the trial court for a written finding to determine whether the subject suit of the Attorney General against the three remaining defendants was frivolous.

I

The Attorney General filed the instant lawsuit in June 1978 against 12 real estate brokerage companies, 14 individual brokers, and the Spokane Board of Realtors, alleging a variety of Consumer Protection Act violations. Prior to trial, six defendant firms, five individual defendants and

the Board of Realtors settled by signing consent decrees with the State. None of the remaining defendants brought any pretrial motions to dismiss or summary judgment motions. When the plaintiffs completed their case, the trial court denied a defense motion to dismiss, ruling that the State had established a prima facie case of unfair business practices in violation of the Consumer Protection Act. The record substantiates that neither the parties nor the trial judge at any time considered this lawsuit frivolous.

II

The purpose of the Consumer Protection Act is to foster fair and honest competition and to protect the public from unfair, dishonest and fraudulent business practices. The statute is to be liberally construed to serve its beneficial purposes. RCW 19.86.920. We have previously recognized this legislative directive in awarding substantial attorney fees to the State when it successfully enforces the statute. *State v. Ralph Williams' N.W. Chrysler Plymouth, Inc.*, 87 Wn.2d 298, 314, 553 P.2d 423 (1976), *appeal dismissed*, 430 U.S. 952 (1977). An award of attorney fees to the State when it prevails promotes the policies of the Consumer Protection Act by encouraging its active, vigorous enforcement by the Attorney General. The majority's award of attorney fees to defendants in the present case has precisely the opposite effect. The Attorney General will now be hesitant or fearful to vigorously enforce consumer protection laws out of concern of incurring substantial attorney fee assessments in the event of unsuccessful litigation.

RCW 19.86.080 gives the trial court discretion in allowing attorney fees to prevailing parties in consumer protection suits brought by the State.[5] Until today, this court has not had occasion to apply this statute in a case where a

---

[5]RCW 19.86.080 states:

"The attorney general may bring an action in the name of the state against any person to restrain and prevent the doing of any act herein prohibited or declared to be unlawful; and the prevailing party may, in the discretion of the court, recover the costs of said action including a reasonable attorney's fee."

*defendant* prevailed in a State antitrust suit as distinguished from a *plaintiff*. The Legislature has, however, specifically instructed us to look at comparable federal law for guidance in construing particular statutory provisions of the Consumer Protection Act. RCW 19.86.920.

Generally, attorney fees are not recoverable by prevailing *defendants* in federal antitrust suits. *Juneau Square Corp. v. First Wis. Nat'l Bank*, 435 F. Supp. 1307 (E.D. Wis. 1977), *aff'd*, 624 F.2d 798 (7th Cir. 1980). The only federal statutory provision for awarding attorney fees to a *prevailing defendant* conditions the award on a finding that the action was prosecuted "in bad faith, vexatiously, wantonly, or for oppressive reasons." 15 U.S.C. § 15c(d)(2) (1982). Our application of a similar standard in awarding fees to prevailing defendants would conform to the Legislature's mandate that the Consumer Protection Act be construed liberally to serve its beneficial purposes.

The United States Supreme Court has set forth the rationale for requiring a *finding* that a lawsuit was frivolous before awarding attorney fees to prevailing defendants in public interest litigation. *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 413–14, 54 L. Ed. 2d 648, 98 S. Ct. 694 (1978). *Christiansburg* interpreted the attorney fee provisions of section 706(k) of Title VII of the 1964 Civil Rights Act, containing language substantially similar to RCW 19.86.080:

> In any action or proceeding under this title the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee. . . .

The Court recognized that routine attorney fee awards to prevailing defendants would seriously jeopardize active enforcement of civil rights laws:

> To take the further step of assessing attorney's fees against plaintiffs simply because they do not finally prevail would substantially add to the risks inhering in most litigation and would undercut the efforts of Congress to promote the vigorous enforcement of the provisions of Title VII. Hence, a plaintiff should not be assessed his

opponent's attorney's fees unless a court finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so.

*Christiansburg,* at 422.

In the case at bar, the majority at page 806 dismisses the *Christiansburg* decision by expressing its concern that vindicated defendants be treated fairly. It is beyond question that honest businessmen should be protected from abusive, coercive uses of governmental power. But this concern must be balanced against the substantial public interest in insuring that consumer protection laws are vigorously enforced. To assume that because the State did not prevail at trial, its lawsuit was unreasonable or abusive would "discourage all but the most air–tight claims, for seldom can a prospective plaintiff be sure of ultimate success." *Christiansburg,* at 422.

A number of states have adopted the *Christiansburg* "frivolous lawsuit" standard in interpreting identical statutory language concerning attorney fee awards to prevailing defendants in public interest litigation. *See Dobie v. Liberty Homes, Inc.,* 53 Or. App. 366, 632 P.2d 449 (1981) (unfair labor practice suit); *Whaley v. Alaska Workers' Comp. Bd.,* 648 P.2d 955 (Alaska 1982) (workers' compensation suit); *Palm Springs v. Retirement Builders, Inc.,* 396 So. 2d 196 (Fla. Dist. Ct. App. 1981) (public utility litigation); *State v. Whitingham Sch. Bd.,* 140 Vt. 405, 438 A.2d 394 (1981) (state civil rights suit). I believe the *Christiansburg* "frivolous lawsuit" standard is consistent with legislative intent in the original passage of our consumer protection law, and was the law of this state at the time the instant case arose. It recently has been specifically statutorily expressed in the Laws of 1983, ch. 127, § 1.[6] Under

---

[6]Laws of 1983, ch. 127, § 1, p. 619 provides:

"In any civil action, the court having jurisdiction may, upon final judgment and written findings by the trial judge that the action, counterclaim, cross–claim, third party claim, or defense was *frivolous and advanced without reasonable cause,* require the nonprevailing party to pay the prevailing party the reasonable

such doctrine, the Attorney General is encouraged to vigorously enforce the Consumer Protection Act without fear that loss of prosecutions would result in large money judgments against the State. Conversely, the State would be put on notice that courts stand ready and able to protect legitimate businessmen from abusive and coercive lawsuits.

## CONCLUSION

I would set aside the attorney fee awards to all defendants and remand to the trial court to determine whether the subject lawsuit was frivolous or prosecuted in bad faith. The fact that the majority of defendants initially named in this action signed consent decrees prior to trial suggests that as a matter of law this suit was not frivolous. However, out of an abundance of caution, I would leave that determination to the finder of fact, as each case should be individually considered.

If on remand the trial court finds the subject action against defendants Tupper, Hege and Sullivan to be frivolous, I would hold that judgment for their attorney fees should be reinstated in their former amounts. Conversely, if the trial court finds that the Attorney General's suit is not frivolous, no attorney fees should be allowed such defendants.

As to defendant Black, even though the trial court finds that the Attorney General's suit is frivolous, to be entitled to attorney fees, Black must also win the remanded trial to determine whether he violated the 1974 consent decree. If he doesn't, he is not a "prevailing party" and would not be entitled to attorney fees, even though the Attorney General's action was frivolous or prosecuted in bad faith.

---

expenses, *including fees of attorneys,* incurred in opposing such action, counterclaim, cross–claim, third party claim, or defense. This determination shall be made upon post–trial motion, and the trial judge shall consider the action, counterclaim, cross–claim, third party claim, or defense as a whole.

"The provisions of this section apply unless otherwise specifically provided by statute." (Italics mine.)

I concur with Justice Stafford's opinion as to the other challenges to the trial court's decision.

DIMMICK, J., concurs with DORE, J.

Reconsideration denied March 22, 1984.